Crestwood v. Hartford Fire & Insurance Co. And could I ask just the lawyers that are going to present oral arguments to step up and identify yourselves for the record. Good afternoon, Your Honors. Ed Murphy for United National Insurance Company. Good morning, Your Honors. Kathy Christian on behalf of Westport Insurance Corporation. Now I'm going to suggest that the insurance companies share some of this time. Judge, we intend to. And I would also say that although there are two motions taken with the case, I would ask the parties to, certainly you may address those, but I would ask the parties to focus on the merits of the arguments that we have today regarding the exclusion. That's my only request. Your Honor, on our side we had sort of discussed that, of course. And since we do have a motion to dismiss the appeal when it's our turn, I will address that for just a few minutes. Ms. Christian will address the merits for the balance if that's up to the court. That's fine. So, Mr. Chemers, we'll begin with you. Good afternoon again, Your Honors. May it please the court, counsel, for the plaintiff's appellant, Robert Chemers, on behalf of the Village of Crestwood and former mayor, Chester Stranza. Your Honors are looking at a 4,000-page record. When you first saw the record, you may have asked your clerk how long the trial was for this case and then found out it was just here on a summary judgment motion. That having been said, Justice McBride mentioned the motion to dismiss the appeal based on collateral estoppel. We think the motion is a matter of attempting by the defendant insurers to duck the merits. We'd ask the court to deny the motion. Or the reason that the insurers currently do not want this court to address the coverage issues, which face an Illinois municipality with several thousand claims by its residents involving unmistakable issues of Illinois law, because of a decision from the Federal Circuit Court, Seventh Circuit Court of Appeals. It is a defensive use of collateral estoppel. It is a lay-and-wait, wait-and-see approach, which frankly we think has no merit. And it has no merit because one of the essential requirements for collateral estoppel is lacking. And that is the issue decided in the prior case is not identical to the issue in this case. They're different insurance companies. They're different policies of insurance. And even if the Seventh Circuit found that the Scottsdale policies were unambiguous, that cannot be applied to different insurance companies with different policies without a review of the other carrier's policies. As this court well knows, your honors have looked at insurance coverage cases many times over the years. The policy must be read in the light of the complaint, and it must be a review of the policy in question. The Circuit Court here did not review any of the policies that were issued in the Scottsdale case. Not one of the 22 policies in that case are in this record. Those policies were not reviewed by the Circuit Court here. The District Court and the Federal Seventh Circuit did not review any of their policies. They're different policies. In fact, they don't even say they're the same. What they say is they are in all material respects the same. So they don't say that they are identical. They have a heavy burden. Who wouldn't like to stand in front of an appellate panel, such as your honors, and be able to tell the court, don't bother. It's all been done before. That's the essence of the motion to dismiss this appeal. For the reasons I've mentioned, we'd ask the court to deny it, because what it really does, it's an end run around the Illinois law, which we think the Seventh Circuit ignored and which we think the Circuit Court here erred in finding not applicable. And that's this court's third district's decision in Erie Insurance versus Imperial Marble. That case, the Seventh Circuit didn't even mention it by name, but rejected it. That case, this court's third district in Ottawa held that we're an insurer. Wasn't that a situation where the EPA had said specifically to the owner that they could go ahead and use the facility? Yes. And isn't that a distinction here where the well in question was something that they were told not to use? The Imperial Marble had a permit from the Illinois Environmental Protection Agency to conduct its business in a certain manner which would require it to emit hazardous materials into the air. The hazardous materials that were emitted into the air were apparently within the limit permitted by the permit they had from the state government. That having been said, the third district said we can't find the pollution exclusion to be applicable, but only ambiguous whereas here the permitted emissions were within the permitted levels. Now, in this case, as we've shown, and they seem to disagree with how we've shown it, the Village of Crestwood was within the MCLs, the maximum contaminant levels set by the federal government. But even if that's true, Mr. Chemers, isn't that a circumstance that would be decided elsewhere? Because if the – it would impact whether there was liability on the part of the municipality for any damages which may or may not have occurred as a result of the ingestion of the water. But it is a distinction where the EPA in Imperial Marble said go ahead and do this. Correct. But here the municipality is saying – is being told don't use this well water. Well, the – Justice Epstein, the EPA told Imperial Marble you can pollute to a certain extent. And the appellate court held when it reversed the summary judgment entered by the circuit court for the insurance company that on summary judgment it's not necessary for the trial court to determine whether the insured's emissions constituted traditional environmental pollution. That was an issue for the tort case. But in the coverage case, if the permit was such that you could pollute within certain levels, then it would be ambiguous to say that pollution exclusion applied. But in our situation, and we regard our case and that case as materially indistinguishable, the MCLs were set and the Illinois EPA in May of 2009 issued a fact study, which is in this record. I think it's 3804 to 3808 in this 4,000-page record, where the EPA states on the third page of that report, at no time did water distributed by the village of Presswood ever exceed the maximum contaminant level set or established by the U.S. EPA. But they still did something that they weren't supposed to do. Correct. And they did something that they weren't supposed to do that the complaints in this lawsuit allege caused injury. So if the complaint, we're looking at the four corners of the complaint and the four corners of the insurance policies. If the complaint says, you're doing something that you weren't supposed to do, which constitutes pollution, caused injury. So the question is, under those circumstances, do the exclusions in the policy bar coverage? Well, to answer that question, for the exclusion to apply, there has to be coverage. Otherwise, there's nothing to exclude. So there would have to be an occurrence, an accidental conduct that caused bodily injury or property damage or both. In these complaints, and there's some 31 of them, at one time or another, there were at least 31 of these lawsuits, individual actions, class actions, and one with 240 plaintiffs not a class action. There are a multitude of different allegations. There are allegations along the lines of what Your Honor just stated. When we talk about an exclusion, we're really not looking at the theories of liability, are we? Well, if Your Honors were to follow the Grand Adam case, Economy Preferred v. Grand Adam, which is a case they hang their hat on, which is from the 3rd District in 1995, which involved a kid taking a bottle of mercury from his parents' medicine chest, going to the neighbor's home and playing with it, where the 3rd District held that, fell within the pollution exclusion. That's a pre-Columns case. Yeah. Well, let's talk about Columns. Columns defines the exclusion to cover traditional environmental pollution. Correct. Is that what we're really looking at? In this case? Yes. No. No, we're not looking at that? No. That's not the test for what this exclusion means? Well, the test would be, what is alleged in these 31 lawsuits? Is that traditional environmental pollution? And why is it not? The answer to that is no. They're not the original polluter. Okay. Well, wait a minute. You say they're not the original polluter. Now, the allegations are that the village was told not to use the water from the well. This is an allegation. Correct. They took the – and they were told not to use the water from the well because a dry cleaning establishment had permitted the contaminants to get into the well. Correct. The well was bad. Yes. Okay. And the village was told, do not use the well. But the village, according to the allegations, took the well water, mixed it with water they had purchased from another village, and then provided that water to their residents. And you're saying that those allegations do not suggest that they were a polluter? No. What do they suggest? They suggest that they were the provider of a defective, deficient, or contaminated product. Well, doesn't that beg the question of how was it that the – you designate the dry cleaners as the original polluter. They had to get their pollutant from somebody else. Isn't the essence of being involved in polluting to take some material, which is toxic or a pollutant, and introducing it into some place it shouldn't be, which, as Justice McBride's scenario based upon the facts of this case established, they had a contaminated entity, their well. They knew, according to the allegations, that it was contaminated, and they chose to mix it with Lake Michigan water, which was supposedly free of all of those things, and introduce it into the – in a position where the residents would use it. And to say that they weren't the ones who produced the original problem with the well, doesn't that really beg the question? Well, to say it in that manner, it would, Justice Epstein, because that goes to what Judge Posner was saying, where he said if the village isn't it, the polluter, then it's the founder of Chicago, the founder of Illinois, and it goes back to Jean-Baptiste Lafitte, or Lafayette. Right. Go back to Adam and Eve, I suppose, if you want to go further back. I think it was DuSable. DuSable, you're correct. But we're not here to discuss the inadequacies, I would say, of the Seventh Circuit decision. We could have done that in a petition for rehearing. Well, the fact is that I'm not really just relying on, with all due respect, on what the Seventh Circuit said. I'm asking the question because it's something that concerns me, not because people down the block did. I appreciate that. And, you know, Justice Epstein was really essentially using words of an Illinois decision when he described a common understanding of a pollutant is a substance that pollutes or renders impure a previously unpolluted object as when chemical wastes leach into a clean water supply. So, I mean, we're not really using language that hasn't traditionally been described. But does Collins say you have to be an actual polluter? No case says you have to be the actual polluter. What Collins said is that the pollution exclusion was intended solely to protect insurers from having to defend and indemnify insurers in connection with governmental cleanup. Right. Now, let me ask you that. I like that language. Is this village cleanup? Is this a cleanup of the mess that they made? No. No? All right. Why not? These are actions for damages for either bodily injury, property damage, or both brought by, you look at the class actions, virtually every resident of the village and every business located within the boundaries of Crestwood. It does not involve governmental cleanup. All right. But does Collins say it has to be governmental cleanup, or does it say we're going to interpret this exclusion to mean traditional environmental pollution? Well, they do use the language, Justice McBride, traditional environmental pollution. That was their mantra. But they also said in connection with governmental cleanup costs, and I'm quoting as at 177 Illinois 2nd at 488. That's where that would be found. That's not what this case is. And the subsequent cases, the post-Columns case, forget economy preferred versus granddad, I don't think a kid playing with mercury in a neighbor's home is pollution. The post-Columns cases involved polluters who were either the actual polluter or persons potentially responsible under CERCLA. And that's not the village of Crestwood. The village of Crestwood sold a product alleged to be contaminated. But the allegations are not just that they sold water. The allegations are is that they were informed not to use this well, that the well was contaminated, that they took that well water, they mixed it with other water that they purchased from another village, and that they then sold this water, put it into the water system of the village, and provided the residents with this contaminated. Are you saying that there's no pollutant involved here? No, I'm not saying that. The perk is a known pollutant. All right. What I'm saying is, in every one of these cases, there are multiple counts. There are counts of negligence. You're asking us to look at the allegations. Well, all you have to do is find one. But you see, that's not really how any of the courts that have looked at this so far looked at it. And even in Columns, when the court discusses whether the exclusion applies, it doesn't look for the theories of liability to see if any of them stand. Like you said at the beginning, the reason that we're here is because the policy provides coverage. The question is, does the exclusion take away that coverage? Columns looked at a boiler or a furnace in an office building that gave off carbon dioxide, which caused illness to people within the building. They found the pollution exclusion to be inapplicable because it didn't go into the atmosphere. It stayed within the four walls of the building. It also found that having a faulty furnace or boiler in a building is not traditional environmental pollution. Yes. We've cited cases that the provision of water by a municipality or by one in the business of providing water. Well, one was the golf course case. That's correct. And the other was Covington. And the other one was, what was the other one? Covington Township versus Pacific Employers from the federal court. It's a little different factually than taking water from a well, mixing it with some clean water, selling it to its residents for 20 years. Those are the allegations. Aren't we really ignoring the part of the factual allegations that this isn't just passing on water. This is taking an affirmative step to mix the water with that supplied elsewhere when the water they're using to mix it with, they know to be water that they are not supposed to use because of the existence of contaminants in it. Well, if that was the only allegation in any one of the 31 complaints, I'd sit down. But it's not. There are numerous allegations. And all we have to do, and all your honors have to do in reviewing those complaints in the light of their policies, is to find one allegation which triggers a duty to defend. There can be 30. And 28 or 29 of them don't trigger a duty to defend. All we need is one. If there's one, then there's a duty to defend that complaint. The complaints are virtually the same. The question is not whether there's a duty to defend. The question is, does the exclusion apply to the allegations that are lodged in this complaint? And are these allegations traditional environmental pollution? We're not going to go through each allegation and see if a theory of liability brings this within the coverage. You said it at the very beginning of your argument. We wouldn't be here if the policy didn't provide for coverage. The question is, does the exclusion then take away that coverage? Not whether there's an allegation of negligent provision of water, which is basically what you said. This complaint is really just about the negligent provision of water. But the allegations are taking a substance that's impure, putting it into another substance, and then providing it to the whole village through the water system. So the question is, does that allege what one might consider traditional environmental pollution? Does Collins require that the village be the actual polluter? I don't know that it does. It doesn't. But the allegations say that the village actually was polluting the water. Well, the allegations say the village distributed or sold water that came through a system that had been, it was a closed system that had the perk within a part of that system. Right. It gets cycled together, and then it's distributed, and it comes out in the taps in the various homes and businesses in the village of Crestwood. Did they put it there? No. Not one case says the village did the polluting. Now, I mean, I guess that's where we can't decide here. I'm not sure that the first person who put it there. We already went through this point. I think we understand your position. And then to be within the scope of the pollution exclusion, then it would have to be a pollutant. We said perk is a pollutant. But if the perk that was in the water and the water that was sold or distributed to the people in the village of Crestwood was within the maximum contaminant level set by the U.S. EPA, as the Illinois EPA says, then there's a question of fact as to whether the pollution exclusion can apply with respect to water that is allegedly contaminated but at a level less than the MCL set by the federal government. And I would submit to this board that the federal MCLs and an Illinois EPA permit, which was given to Imperial Marble, are indistinguishable. There really is a distinction without a difference from the standpoint that it shouldn't matter. The federal government set the MCLs. The Illinois EPA wrote a fact study of four or five pages that said, based on our investigation and the history of the examination of the situation in Crestwood, we have determined that at no time did the water sold by the village exceed the MCL set. Well, I think it could be argued that that really goes to whether the village would be liable, not whether the exclusion applies in this case. Well, if the court were to follow a third district, it would go to whether the exclusion applies because the exclusion would be ambiguous and the court would say the exclusion would be liable. Well, the Supreme Court has kind of already told us it's not ambiguous. They're going to interpret it in a particular fashion, and that is that it excludes traditional environmental pollution. I don't think we're at the ambiguous stage anymore. Well, what the third district said is you don't have to determine whether you have traditional environmental pollution on a motion for summary judgment. Yeah, but we're looking at what the Supreme Court is telling us, not what the third district suggests. I mean, I think that's where we are. We are bound to follow what the Supreme Court has said we look at in determining whether the exclusion applies in a given case. I don't think we look at Imperial Marble for our guidance. I think we do have to rely on columns. What about this suggestion that in your brief you describe discharge at page 37, the accidental or intentional spilling, leaking, pumping of hazardous waste into or upon any land or water. Does this kind of fit in with that general idea? I mean, were they pumping or pouring or doing anything like that at the village? These are the terms of art that are described. Because we do have terms of art in these policies, the policies that are in front of us. Right, and what we're saying is that those terms of art aren't applicable to the cycling of water through the closed system into the homes and businesses through the faucets and the taps in those homes. It's not a discharge, it's not a release, it's not a threatened release. Is it a pumping or a pouring? Is it an emptying? Any of those? Well, I don't know if the water system of the village of Crestwood was emptied in order to sell or distribute the water or if it was pumped. I imagine it was a pump that had to be used to get the water through the closed, I'm not an expert on their well system there. But the release or discharge of a pollutant, no, the pollutant was in the water. They distributed the water through the normal course of what municipalities do in this state. Part of the municipal function is to provide water to the citizens. Well, if we could ask you about that. That is, was there business to work with chemicals? Was that their core activity? The village of Crestwood? Yes. No, the village of Crestwood provided police protection for the citizens. They picked up the garbage. They had a tax base. They provided parks and schools and the things that Illinois municipalities do. And, of course, they also provide water. They had nothing to do with chemicals. The chemicals were dumped by the dry cleaner a block or two away from the location of the well, years before the water was actually cycled through that system with that perk in it. And I would point out that the we're talking about the allegations. The allegations go across the board in these various lawsuits. I'm sure Your Honors have looked at these complaints. There are allegations of negligent failure to warn or failure to use a well, failure to provide an unsafe product, which is water. That's what the case is about. The case is about a product. The product is water. The village didn't pollute. Not one lawsuit says the village was the polluter. I think that's an important distinction. These exclusions, which at one point you argue might be ambiguous, seem to be drafted in the broadest possible terms to alert the policyholder that really if the foundation of any claim is an environmental problem based upon pollution, that this would be excluded. And it's certainly clear that if there hadn't been polluted water, none of the other things would matter. Well, that's certainly correct. Bear in mind this is the so-called absolute pollution exclusion because the industry and the courts went around circles for years. For those who practiced back in the 80s or sat on the bench back in the 80s or the early 90s, it would be sort of the 70s. The sudden and accidental exception to the pollution exclusion. Well, the industry gets rid in 1986 of sudden and accidental. It came up with absolute. And it was like the Supreme Court in columns where they discussed the drafting history for some length. And as I discussed with Justice McBride, they said it was intended solely, quote, to protect insurers from having to defend and indemnify insurers in connection with governmental cleanup costs. And that's no different than the Supreme Court of New Jersey in the Morton case or the Supreme Court of Louisiana in Gore. Both cases ignored by the Seventh Circuit. Both cases not embraced by the Circuit Court here, which discussed the drafting history and the purpose and the intent of the industry for the pollution exclusion. And it was to apply, as our Supreme Court said, and I don't know if the term was original with Justice McMorrow in that case or if it was from the literature, it applied to traditional environmental pollution. One would think it would apply to a paint factory that dumped its garbage into the sewer. The question really before us, at least in part, is if that was the motivating force for the redrafting of the exclusion, does that mean that the plain language of the exclusion, if we interpret the plain language to be unambiguous, should be ignored? And should we then ignore the fact that the Supreme Court has told us that we should look to whether it's a traditional form of pollution? The Supreme Court talks about traditional environmental pollution, and yet panels of this Court, Kim v. State Farm, that wasn't traditional environmental pollution. That was a dry cleaner dumping perk into a packed lot behind the dry cleaning plant that polluted the ground. Connecticut Specialty Insurance versus- Why isn't that a traditional pollution? Well, traditional pollution would be- Putting something that's dangerous someplace where it shouldn't be. By someone in the business of polluting. That's a dry cleaner dumping the byproduct of his machine into the land. If that's traditional environmental pollution, that is far afield from what is involved in this case, not with respect to playfield cleaners, the polluter, but with respect to the village of Crestwood that was the victim of that byproduct, if you will. Well, I'm not going to engage in whether they were a victim or not. They were a victim of having their well polluted. The question is what they did with that well once it was polluted. Right, and what they did with that is- Why would they be putting this into all these policies, commercial general liability policies, but it was only for people that are in the business of- who pollute as part of their business? Well, I think someone who is in the business, any business where pollution is a byproduct or a necessary aspect of the business would know that the commercial general liability policy is not going to protect that business. There are policies you can buy. There's environmental impairment liability. There are specialized policies for polluters. Yes. Big premium, big deductibles. What about for everybody else that's not a traditional- that's not part of their business to pollute? That's correct. What about them? They don't- they get a pass when they pollute? Someone who is in the business of polluting? I mean, I didn't realize your position was that this should be limited to businesses and industries that have these byproducts that traditionally cause pollution. No, our position is the village of Crestwood when examined in the light of the allegations of these various tort complaints is not involved in traditional environmental pollution by selling allegedly contaminated water through their water system in the village. That's not traditional environmental pollution. No, but the allegations are not simply that they were selling water that they were lacking any knowledge of. The allegations are that they had a bad well that was contaminated with perc, that they took that water, that they mixed it with clean water, and that they then sold that combination of contaminated polluted water, actually put it into the water system for the village. Those are the allegations. Now, the question, I think, is really does that suggest of traditional environmental pollution? But I didn't- I don't know that it means, you know, you have to be in the business of- No, that's not what I'm saying. What I'm saying is when you really have to do, and the court may not want to because the insurers are telling it not to, to do a traditional duty to defend analysis. They say they don't have a duty to defend. Yet what they have is they have a duty to indemnify for ultimate net loss, ultimate net loss depending on which policy is defined to include costs, and costs are defined- You'd usually be arguing their side. Normally. This is unusual. It broadens your horizon and gives you more interest. You never know. Well, shall we hear from them, and you'll have some time to rebuttal? That would be fine, Your Honor. All right. In case I forget, I will, of course, ask this court to reverse. Thank you. Good afternoon, Your Honors. Ed Murphy for United National Insurance Company. Your Honors, as you know, the three insurers here, which are United National, Ironshore, and Westport, have filed a joint brief, and we will argue jointly. We do have a motion to dismiss the appeal. I do want to address that just for a few minutes here, and Ms. Katherine Trisham will address the merits of our brief. We believe that the motion to dismiss is well taken, and we do want the court to consider it, because this identical issue was already conclusively determined by the court. What about the differences in the insurance policies? That's the question that I had in my mind when I first considered whether we should even file this motion, and the answer to that, Your Honor, is this. The issue decided in the federal court and affirmed on appeal was not related, really, to any differences among the insurance policies at issue in that case. And in this case, the language from one policy to the next is not really an issue either. The issue that was decided before, and the issue that the village here is asking this court to decide, is whether the underlying complaints allege that they engaged in traditional environmental pollution. If you look at the briefs, and we've attached the briefs in the federal case to our motion, if you look at that, the arguments are the same, the issues are the same. The argument is not what you might consider classically in a coverage case, whether a particular exclusion, the wording of it, is ambiguous in the sense that it's subject to more than one reasonable interpretation. That's not what they've argued at all. What they've simply argued is what the underlying complaints allege don't put us in the category of traditional environmental pollution. So what they've said to all the courts here, really, is any absolute pollution exclusion will not exclude coverage for us because of what we're alleged to have done is not traditional environmental pollution. And if you look, they've never really advanced any other argument. There hasn't been any focus on the language of the policies themselves. So, therefore, I submit that the issue is the same that was decided in those other courts. Did you put this issue of preclusion question before Judge Mikva? No, we did not, Judge, and here's the reason we didn't. Because the judgment was not yet final, and that's an element of collateral estoppel. There has to be identity of issues. There has to be essentially identity of party or privity, and then there has to be a final judgment on the merits. Did you ask her to wait? No. I mean, why not say to Judge Mikva, I don't want to play with this, but why not say to Judge Mikva, you know what, the Seventh Circuit's about to issue an opinion on this. It's the same issues. Can we just wait and see what happens? Because we think it may be an issue of preclusion situation. No, we did not. If it didn't, were you just fishing around for a couple of different court notes? No, let me just say a couple of things about that. Number one, the federal courts got it right, and if you address the merits here, you're going to get it right as well. Right. But the reason we didn't at that point is that case was that case. It was over there. It was decided by the district court. The trial judge had decided it, but we didn't have any idea how long it would take the Seventh Circuit to get around to it. And I would point out that the Seventh Circuit opinion became final when the village decided not to file a petition for writ of certiorari, and that time ran out eight days before they're supposed to file their brief in this case. So we not only could not present it to judgment because we didn't have final judgment, but we couldn't really determine whether we should bring that motion until we saw their brief. So that's why we didn't wait. So to answer your question, Justice Epstein, I think I have, and that is that the actual issue that was litigated and the issue that was decided is identical to the issue that has been presented here, and it was ruled in the way it was. The village presented it. They lost. It was affirmed on appeal, and they exhausted their appeal. It's a final judgment, and our motion should be granted. And that's all I have to say on that, absent any other questions from the panel. Ms. Chrisham will address the merits. Thank you, Mr. Murphy. Good afternoon, Your Honors. May it please the Court. My name is Kathy Chrisham, and I'm here representing or speaking on behalf of all of the insurers in the case. If I could just take 30 or 40 seconds and respond to one of the panel's questions about the motion that we have filed to dismiss the appeal in collateral estoppel grounds. The question was raised whether we brought up the issue before Judge Mikva of collateral estoppel. We did bring it up in the summary judgment briefing. We noted for the Court that we anticipated this would be an issue coming up because both actions were going on at the same time, and we also noted for her that we were not bringing the issue up, raising the issue at this time because we did not have a final judgment. The question also became, were we fishing around at all? Were the insurers trying to see which action would come out better? I think what we need to keep in mind here is that the procedural posture and the related procedural posture of both cases was not something that we did. The village was the plaintiff in both, and they decided presumably for whatever constellation of reasons not to bring all the insurers before the federal court. Exactly, and not to ask the trial court to wait out the judgment of what might be the final judgment. The judgment of the district court and the final judgment of the Seventh Circuit, if it were to be appealed. The last issue with respect to the motion concerns the policy language. The village has not. There was a slew of briefing, as you can imagine, in the trial court here for Judge Mikva, and Judge Mikva was confronted with, and both parties were arguing about the Scottsdale decision then from the district court. There was a lot of argument about the Scottsdale decision and how it was argued, how it was decided. What the village did not do was argue at any point that the language of the pollution exclusions in the Scottsdale case and the language of our absolute pollution exclusions was so materially different or was materially different at all that it should dictate, the language should dictate a different result. That was an argument they could have made, and they haven't made it. With respect, turning to the merits of the case, with respect to the question before the court, the panel is correct that Columns is a Supreme Court case that controls how we look at this question. Columns sets forth, really distills down the absolute pollution exclusion and presents, says that we must approach the question of whether it applies by looking at whether there is, in the underlying claims, traditional environmental pollution. In order to make that determination, we have to look at the underlying complaints. As the panel has observed, the underlying complaints, while there are many allegations and they are pled in different theories of liability, the underlying complaints all allege the same set of common facts. And the facts that they allege, which this court has alluded to, so I won't go through all of them, are that the village took contaminated groundwater, mixed it with clean water, and distributed that throughout its water supply to its residents. The village cannot claim that it is not an active polluter, or that it was somehow its role in this was passive. The village has attempted to draw here two scenarios. They suggest that there are two wholly independent causes of the pollution, pardon me, of the injuries in the underlying complaints. One, they characterize as their negligent provision of water to the residents, and the other, looking back to how the contamination occurred, was the initial groundwater contamination, whether it was due to the actions of a dry cleaner or to some other entity. There are not two distinct, or as the case law phrases it, wholly independent causes of action here. There is one cause of action. There is one continuous process that resulted in the injury to the underlying plaintiffs. But for the initial contamination, the initial groundwater contamination, however it occurred, there would be no injuries that the residents would be claiming. Similarly, but for Crestwood, taking the contaminated groundwater from its well, mixing it with clean and distributing it, contrary to IEPA directives, there would be no injuries. Both events had to take place for the injuries which we see complained of in the underlying complaints. So there is no independent cause, and it's invalid to look only at the theories of liability in order to determine whether there is traditional environmental pollution. If I could touch for a minute on this question of the duty to defend that has been repeatedly brought up in the briefs in an oral argument. The policies before this court are excess policies. The village has acknowledged that the policies do not contain a duty to defend. We have a duty to indemnify defense costs. That duty to indemnify, whether it's to indemnify a settlement amount or to indemnify defense costs, does not bring us within the duty to defend strictures that this court and most jurisdictions apply. In order to, in looking at what our obligations are here, we don't look at whether we have a duty to defend. And this court, just like the trial court, could not, if you determine that the pollution exclusion doesn't apply, it doesn't follow that we will have a duty to defend. The duty to defend is not at issue before us. And following up on that, if this court were to rule that the absolute pollution exclusion doesn't apply, that doesn't even determine that we have a duty to indemnify. There are a host of issues which Judge Mikva reserved. It turned out she didn't have to address them because this issue was dispositive. But there would be issues that would wait. Turning back to the merits and the determination by Judge Mikva that the underlying complaints do fall within traditional environmental pollution as defined by columns. All of this court's decisions post-columns, since 1997, have applied columns. And I know the village has suggested that what we saw in Kim and what we saw in Connecticut Specialty was not traditional environmental pollution. We think that this court did correctly apply columns and did find that the allegations in those cases were traditional environmental pollution. We also think here that the court can come to no conclusion other than that the allegations in the underlying complaints also consist of traditional environmental pollution, which brings them within the absolute pollution exclusion in our policies. There's been discussion about whether, for purposes of applying the absolute pollution exclusion, the village is contending that an entity must be in the business of polluting. The insurers don't believe that that's part of columns. That restriction isn't in columns either directly or as you read through the spirit of columns. But even if, and I will address that further, even if there is an argument that there is a requirement that you be in the business of polluting, unfortunately, although it shouldn't have been, the village here was in the business of polluting. This was not a one-off situation where they accidentally spilled some groundwater, they accidentally used groundwater from a contaminated well for a short amount of time. This was an intentional act. They knew that they were using the groundwater. They did it for 22 years. And these are not my assertions. These are the assertions in the underlying complaints. And they did it to save money. And they did it knowing the IPA. You could follow that along and say, you know what, if they decided to start to take this course of action and do it for this many years, they should have went back to their insurer and told them, oh, by the way, this is what we're going to do, and so let's talk about levels. And then we could fall into that class of businesses. There is certainly an argument, and it seems to be suggested in the Seventh Circuit's decision, that when the insurers are making determinations and they have expectations about what entities businesses are, and when you write policies you certainly do an investigation into what type of business that the policyholder is conducting, you would look into this kind of thing. And if you were aware that they typically work with polluting chemicals or that they, I can't even imagine, it would be outlandish, but if they came and told you, yes, we provide water to our residents and we're now using a well that's contaminated, it would certainly affect how an insurance company decided to, what type of policy they decided to issue and probably the premium for it. Here that wasn't the situation. These policies were issued for, there were eight policies. They were issued in the late 80s and early 90s. At that time, the village had been contaminating for several decades or at least 15 years and then continued to through 2007. Is part of their business, though, to provide water? Yes, part of the village's services to its residents is to provide water. And the reason that the provision of water doesn't enable the village to fall within the Tough Coast central business activity construct is really twofold. First, Tough Co in the central business activity argument has never been adopted by the Illinois courts. Collins discussed Tough Co and rejected, didn't reject, discussed Tough Co and did not adopt the central business activity argument. Did they not adopt it or did they just not really discuss it? They didn't discuss it at all. In their lengthy discussion of Tough Co, they did not address that issue. A later case in Kim, Kim did discuss the central business activity argument in Tough Co and did not adopt it. In addition, if you look at Tough Co, again, it's a state, it's a North Carolina decision. Tough Co, even on its facts, is inapplicable to the facts before us. In Tough Co, the chemical that was being used there by the flooring company, it was a chemical that they routinely used in their business. It was what they did. They used this chemical to surface floors. That is why, that is the basis for why the court said there could be an ambiguity if this entity believes it's buying insurance to cover its business, it routinely uses these chemicals. It's part of their business plan to use this chemical as opposed to the fact that if you distribute water to your residents, it isn't necessarily a part of your plan to take water that you know to be tainted and supply that to your, that's the distinction you're searching for. It is a distinction, and I would say it's not only not necessarily part of your plan, it should not be your plan to do that. What about that Louisiana Supreme Court case? What would you say about that? The Doar case was also, that's also a case that's been brought up when the district, when the Seventh Circuit discussed this issue, and the Seventh Circuit was presented with the arguments in Doar and did not refuse to adopt them. In our case, Doar was argued to Judge Mikva, and Judge Mikva found that while Doar could be applicable if the Illinois courts adopted it, Illinois courts have not. It's not binding on our courts. But we know it's not binding. We know it's not precedential for our purposes, but I'm asking you to distinguish or say why that reasoning shouldn't be followed. Doar is in conflict with several of the decisions from this court, from the Illinois Appellate Court. Give me one moment. I'm just trying to get my sight. What Doar does is it sets forth a framework. It doesn't determine that the absolute pollution exclusion does not apply. It sets forth a framework for what the courts need to consider, and one of the things it says, one of the factual questions that it says must be addressed is whether the polluter, whether the insured is a polluter. Now, that is a question that the Illinois courts have addressed and rejected. In Housing Authority, the Seventh Circuit applying Illinois law said that it is not necessary that the insurer, insured, pardon me, be the polluter. In that case, the insurer, the insured owns the property, the housing project, Altgeld Gardens. It was not responsible. It had nothing to do with the pollutants getting into the ground where the development was eventually constructed. The court there found that the absolute pollution exclusion applied and said that it applies regardless of the origin of the pollution. So Doar doesn't fit within, in fact, it's in conflict with the decisions under Illinois law saying that there is no requirement that the insurer be the polluter in order for the absolute pollution exclusion to apply. I think what we would like to leave this court with, besides our motion to dismiss on collateral estoppel grounds, which we believe is well-founded and compels a dismissal here, is that the allegations of the underlying complaints must be what is focused upon. We can't look at the way the village characterizes what it did here, negligently providing water. We can't focus only on the theories of liability as the village is asking this panel to do. We have to look at what the underlying complaints say. And when you look at the underlying complaints and you compare them as columns, and the Supreme Court say we must, to the concept traditional environmental pollution, we don't believe there is any conclusion to come to other than that these absolute pollution exclusions, like those in the Scottsdale cases, do apply to the Crestwood underlying complaints, and that therefore our insurers have no obligations, indemnity obligations, or otherwise under our policies. All right. Thank you, Ms. Grisham. Chambers, a brief remark or two? Thank you, Your Honor. Your Honor has just heard it from the attorney for the insurers. You have to look at the underlying complaints and compare them to the language of the policy. That is a traditional duty-to-defend analysis. Notwithstanding the fact they say they don't have a duty to defend. And I'll point out one of their policies. This is at C2700 of the record. It's the Trans-America Policy, which I think is now Ironshore. We will have the right and duty to defend any suit seeking those damages, damages because of bodily injury or property damage. They do have a duty to defend. And a duty to reimburse the cost of defense is no different than a duty to defend. The analysis is the same. Justice Epstein, you asked about the joinder of parties in the federal case. The plaintiff in the federal case was not my client. It was Scottsdale. But you filed a counterclaim, right? We filed a counterclaim against Scottsdale. Right. And basically chose at that point not to. And I'm not casting aspersions. You chose not to litigate against all the other insurance policies. If we could have even had diversity over them. Yes, that's correct. We did because we were dealing with 11 policies, 11 primary policies, 11 excess policies that we frankly thought unmistakably applied and would have given us a duty to defend. But were we wrong? First Judge Kendall, then the Seventh Circuit. In fact, the Seventh Circuit argument, interestingly enough, was almost a year ago to the day. I argued that January 13th, Friday the 13th of last year, disappealed to the Seventh Circuit. That appealed to the Seventh Circuit. Justice Palmer, you asked about why didn't they ask Judge Mitva to stay this. They certainly could have. She ruled on December 13, 2011, entered a final judgment December 14th. The Seventh Circuit entertained argument, and we probably knew about it, one month later and decided the case in March. Then, with this motion to dismiss the file on their version of collateral estoppel, they waited until two months after we filed a brief of appellants in this court. We think that should have forfeited their right to even file an appellate brief, which was my motion to dismiss. But you took that with the case. This is a classic way of doing it. Mr. Chemers, I'm having a flashback, and in that flashback, you're standing in front of me on the 24th floor of the Daly Center, representing an insurance company, and you're telling me, Judge, when we sat down with Crestwood, they told us they sold water. They didn't ever tell us that they were going to intentionally mix a pollutant with the water and sell it to their citizens. And if they would have told us that, Judge, we would have told them, you're in an exclusion, and we're going to have to sell you a more expensive policy. That's what you would have told me if we were sitting over there. Well, fortunately, lawyers can argue out of both sides of their mouth, depending on who's paying their bill at the time. But this case, I represent a policyholder. We all acknowledge that. This case, I represent a policyholder. And your Honor, as we're talking to Kathy Christian about it. But, I mean, not to avoid the point, but I didn't mean to be more colorful than I needed to be. Not to avoid the point. The point which came up in the last argument was, you know, if the insurer, you know, when the insurer writes the policy, they look at the, like you said, the business that the insurer is in. And if the insurer tells the insurer, we're in the business of providing water, that's one policy, and it has a particular exclusion. But even as you said, the insurance industry has other types of policies that they will use when the insurer comes to them and says, we're a polluter, and we're going to put out this pollution, and it's going to be at these levels. You're going to hit them with a higher premium, and the policy is going to be different. So why is this a different situation? Well, we're dealing here with policies that are, frankly, nothing like the Scottsdale policy. The Scottsdale policy was a compendium of coverages. This is nothing but a broad, general liability policy written excess to a retention. And they say they don't have a duty to defend. My client submitted an affidavit almost two years ago saying that the village spent more than $2.5 million defending these lawsuits. That amount has doubled since then. We've satisfied every retention and every deductible. And contrary to what you heard from counsel, it wasn't decades later that their policies incepted. It was two years later. Their policies are late 80s to early 90s. The pollution occurred in 1986 or 1987. It wasn't years earlier as that was made out to be. What would you say about that? I know it's a federal case interpreting Illinois law, the Chicago Housing Authority, where basically they held that the absolute pollution exclusion barred coverage for injuries by hazardous materials that were introduced, released, or allowed to remain in the environment at Atkel Gardens by the surrounding industrial plants, abandoned factories, toxic waste dumps, landfills, etc. by the PCPs introduced, released, and allowed to remain in the environment at Atkel Gardens. That is the only case in Illinois, it's not an Illinois case, it's a federal case, that held that the owner of property could be liable as a polluter. And the owner of property, which is the Chicago Housing Authority, would have no coverage for the claims of residence against the CHA for the injuries they sustained as a result of inhaling the pollutants that were coming out of the ground where their homes were built. It's the only case. Beside the Seventh Circuit decision in Scottsdale v. Village of Crestwood, where they held the municipality that sold the water polluted by somebody else was not entitled to insurance coverage for the lawsuits filed by the residents of the village who were the taxpayers who were paying for the defense of these lawsuits. Your Honor has discussed columns with counsel for the insurer and talked about Tufco. The Supreme Court at 177 Illinois 2nd at 493 agreed with Tufco's analysis. They agreed with Tufco's analysis not from the business perspective, but from its approach to the pollution exclusion and what it meant when the industry went from sudden and accidental to absolute. And the quote would be found at 177 Illinois 2nd at 493. We agree with this analysis. And then they talk about how the change in the policy language affected the exclusion. And then they held the accidental release of carbon monoxide, in this case due to a broken furnace, does not constitute the type of environmental pollution contemplated by the clause, found the exclusion ambiguous, and held there was a duty to defend. Now, the third district, following columns in Erie v. Imperial at paragraph 22, said the policy's pollution exclusion is arguably ambiguous as to whether the emission of hazardous materials and levels permitted by an IEPA permit constitute traditional environmental pollution excluded under the policy. Then they say in American States Insurance v. Columns, the court rejected a literal interpretation of a pollution exclusion that was identical to the provisions in the instant policy, finding the exclusion ambiguous. And they then rejected the holding of the trial court because it didn't follow, didn't follow American States. And they then went on to say that at this stage in the proceedings, this is what I discussed with you, Justice Simpson, at this stage in the proceedings, and they're talking about a coverage case, not the personal injury case, it is not necessary to determine whether Imperial's emissions constitute traditional environmental pollution. We can put that in your Honor's opinion and say at this stage in the proceedings it is not necessary to determine whether the village of Crestwood's sale of allegedly contaminated water constituted traditional environmental pollution. That is not for this case. And, in fact, the Seventh Circuit, when it spoke to that issue, referred to, I think the language was, maybe, maybe the regulations are too lax. The cases will go to trial and the plaintiffs will fail. The tort cases will fail. In the meantime, the village is facing its taxpayers as the plaintiffs, defending itself with taxpayers' money when it should be defended by its insurers because these claims, and there are numerous claims in these lawsuits, do not constitute traditional environmental pollution. This is not a case where it's just as simplistic as Justice McBride quoted as far as what the village allegedly did. It talks about ignoring or disobeying applicable law, failing to disclose what was in the water, selling the water that was unfit for human consumption. Now, that's a fact question. Failing to notify and warn the plaintiffs of the subject contaminated water. Again, that's a negligence allegation. That's a fact question. Was it contaminated? And if it was contaminated, was it contaminated at a level below the MCL set by the federal government, which the EPA found at no time did the village of Crestwood's water exceed the MCL's? That's a fact question. That renders the pollution exclusion ambiguous, which puts the insurers into a position of having to provide a defense. I'd ask the court, deny the motion to dismiss on collateral estoppel grounds and reverse and remand this case to the circuit court with direction to enter judgment for the insurer that the carriers have a duty to defend. Any other questions, Your Honor? No. The case will be taken under effect. Thank you, Paul. Thank you all very much for a well-argued and well-presented case.